## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER ALAN CARMICLE | ) | Case No. 17-32918(1)(7) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| BROWN JORDAN INTERNATIONAL, INC., *et al.* | ) ) | AP NO. 17-3069 |
| | ) | |
| Plaintiff (s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER ALAN CARMICLE | ) | |
| | ) | |
| Defendant(s) | ) | |

## **<u>MEMORANDUM-OPINION</u>**

This matter is before the Court on the Motion For Judgment on the Pleadings of the Plaintiffs Brown Jordan International, Inc. ("BJI"), BJI Holdings, LLC, Brown Jordan Company ("BJC"), and Brown Jordan Services, Inc. ("BJS") ( hereinafter referred to as "the Plaintiffs" or "the Company") and the Motion for Judgment on the Pleadings/ to Dismiss filed by the Defendant, Christopher Alan Carmicle (hereinafter referred to as "the Defendant," "Carmicle," or "the Debtor"). The Court considered the Plaintiffs' Motion, the Defendant's Motion, as well as the written Responses and Replies of each party to the other's Motion. The Court also considered the oral arguments of counsel for all parties at the hearing held on both motions and the Opinion of the United States District Court for the Southern District of Florida in Case No. 0:14-CV-60629 and Case No. 0:14-CV-61415, (hereinafter referred to the "District Court Opinion") attached as Exhibit A to Plaintiffs' Motion for Judgment on the Pleadings. For the following reasons the Court will **DENY** the

Defendant's Motion for Judgment on the Pleadings/to Dismiss and **GRANT** Plaintiffs' Motion for Judgment on the Pleadings.  A Judgment in favor of the Plaintiffs on their Complaint to Determine Dischargeability against Defendant pursuant to 11 U.S.C. §§ 532 (a)(4) and (a)(6) of the United States Bankruptcy Code accompanies this Memorandum Opinion.

## PROCEDURAL  BACKGROUND

On March 2, 2016, the United States District Court for the Southern District of Florida issued a Judgment in favor of the Plaintiffs and against the Defendant in the amount $1,003,582.69.  Of that amount, $38,322.11 constituted punitive damages which entitled Plaintiffs to recover costs and attorneys' fees of $911,503.47, for a total award of damages of $950,125.28 due to Defendant's violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.* ("SCA").

On September 12, 2017, Debtor filed his Voluntary Petition seeking relief under Chapter 7 of the United States bankruptcy Code.

On November 17, 2017, Plaintiffs initiated this Adversary Proceeding with the filing of a two Count Complaint against Defendant seeking a Judgment declaring the $950,125.28 portion of the District Court Judgment nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).

For purposes of resolving both of the parties' Motions before the Court, both parties agree that the findings set forth in the District Court's Opinion need not be relitigated as the doctrine of collateral estoppel applies to the District Court's findings. The parties disagree, however as to whether those factual findings support a Judgment of nondischargeability in this case.

Since the present case involves a Judgment of the United States District Court, the elements of federal collateral estoppel apply.  Those elements are: (1) the issue sought to be precluded was the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was

determined by a valid and final judgment; and (4) the determination was essential to the prior judgment. *Montana v. United States*, 440 U.S. 147 (1979).  There is no dispute by the parties that these elements are met and they apply to that portion of the District Court's findings that the Defendant violated the SCA resulting in Judgment in favor of the Plaintiffs in the amount of $950,125.28.

## INTRODUCTION TO MATERIAL FACTS

After thoroughly reviewing the District Court's Opinion and the briefs of the parties herein on the pending Motions, the Court finds that the recitation of the material facts as set forth in the Plaintiffs' Motion for Judgment on the Pleadings accurately recites those facts and is supported by accurate citations to the District Court's Opinion.  Therefore, the Court will incorporate below ¶¶ 3-48 from pp. 3-14 of the Plaintiffs' Motion for Judgment on the Pleadings and adopt those findings herein.  Citations to "Exhibit A" refer to the District Court's Opinion.

## MATERIAL FACTS

Christopher A. Carmicle ("Carmicle" or the "Debtor") was employed by BJI, pursuant to a written employment agreement, to manage BJS and BJC (the "Subs"). [Exhibit A, pg. 5].

Beginning in 2011, BJI's CEO and chairman of the board of directors (the "CEO"), and other members of the Company's management team began to have reservations about the Debtor and his management of the Subs. [Exhibit A, pg. 5].

Company management learned that the Debtor's wife "remained on the payroll and had received several raises in salary at Carmicle's direction and with Carmicle's sole approval, despite little evidence that Mrs. Carmicle continued to provide services to the Company, while profits were low and a number of full-time employees had been laid off."  [Exhibit A, pgs. 5, 21-22, 35-36, 40].

The Company also learned that, between 2007 and 2011, Carmicle had made payments to the University of Louisville for sports tickets and donations in amounts that exceeded the Company's approval by more than $153,645.00. [Exhibit A, pgs. 5, 23-24]. This was in addition to tens of thousands of dollars for various other "excessive" and "unauthorized" entertainment expenses. [Exhibit A, pgs. 5-6, 24].

Finally, "everything began to unravel for Carmicle in 2013," when the CEO learned that Carmicle had disobeyed a direct order not to hire a specific individual to manage freight for the Subs and not to make any changes to the company's freight management program. Shortly thereafter, one of Carmicle's "controller[s] resigned under peculiar circumstances." [Exhibit A, pg. 6].

The CEO expressed his desire to terminate Carmicle for cause in the spring of 2013, but was convinced not to do so because BJI Holdings had hired an investment bank and had offered the Company for sale, and the termination of a management-level employee may have complicated the sale process. [Exhibit A, pg. 6].

In the summer of 2013, the Company was transitioning email servers and, as part of that process, BJI's chief information officer provided all employees, including the Debtor, with a generic password to test if their new email accounts had been properly activated.   Exhibit A, pgs. 7, 47].

At the time, Carmicle believed that one of his subordinates was communicating directly with the CEO. Carmicle decided to see if he could access their email accounts by using their user names and the generic password that he had received as part of the server transition - he could. Carmicle proceeded to read their emails on multiple occasions and then "repeatedly accessed other employees' email accounts with the generic password and used his personal iPad to take screenshots of hundreds of emails over the next six months." [Exhibit A, pg. 7, pgs. 47-50].

-4-

Although the Debtor claims that he does not remember whose emails he accessed, when, and how often, "[a]t the very least, Carmicle admits using his iPad to access, view, and take screenshots of numerous emails sent or received by the CEO, Tortorici [BJI's chief financial officer], King [BJI's general counsel and head of human resources], Elton, and other [BJI] employees, many of whom worked for BJI or other entities for which Carmicle had no managerial responsibility." [Exhibit A, pg. 49].

During this same period, the Subs managed by Carmicle were financially underperforming. The next meeting of the board of directors of BJI was scheduled for early February, 2014. Carmicle was concerned that the Subs' poor performance and the issues regarding his unauthorized employment of his wife and excessive entertainment expenses would be raised by the CEO at that meeting and that he would be terminated as a result. [Exhibit A, pgs. 7, 51-52]. Specifically, Carmicle "felt that there was a target on his back [and] that he needed to make a move . . ." [Exhibit A, pg. 51].

"Carmicle saw the writing on the wall. In an attempt to save his job, Carmicle wrote a letter to BJI's Board of Directors in January of 2014, accusing the CEO and others of various illegal and fraudulent activities . . ." [Exhibit A, pg. 7]. In his letter "Carmicle blamed [the CEO], King and Tortorici for the "disastrous" performance of [the Subs] in 2013 and expressed his suspicion that that they would attempt to shift blame to Carmicle." [Exhibit A, pg. 52]. He also alleged that the CEO, King and Tortorici had acted improperly in connection with the proposed sale of the Company and that they had been "secretly examining his expenses in an attempt to discredit him." [Exhibit A, pg. 52].

Immediately after sending the January 2014 letter, Carmicle purchased a personal laptop computer and migrated data from his Company-owned laptop to his new personal laptop. Carmicle also purchased a new personal iPhone, stopped using his company-owned iPhone and wiped the company-owned iPhone of all data. [Exhibit A, pg. 52].

After receiving Carmicle's January 2014 letter, members of the board emailed Carmicle and spoke with him over the telephone. "When asked how he had obtained the information contained in his letter, Carmicle stated that he had stumbled into it, and that it was all aboveboard, but that he had been advised not to say anything more at that time." [Exhibit A, pg. 54]. At no time, did Carmicle inform the board that he had obtained the information by accessing employee email accounts, including the accounts of senior management and board members. [Exhibit A, pgs. 54-55].

The Board sought legal advice regarding the letter and ultimately hired an independent attorney to investigate the allegations contained therein. [Exhibit A, pgs. 7-8, 55-56]. The independent attorney was a partner in a large international law firm who had extensive experience conducting independent investigations based on whistleblower reports.

On February 10, 2014, the independent attorney (Pearlman) presented his findings to the BJI board. Pearlman "concluded that the allegations of misconduct in Carmicle's January 20, 2014 letter were baseless." [Exhibit A, pg. 59]. Pearlman further concluded that "Carmicle had used in excess of $100,000 of company funds for unauthorized entertainment expenses." [Exhibit A, pgs. 8, 59]. Finally, Pearlman reported "that Carmicle "had been breaking into" the email accounts of other employees, including Carmicle's superiors" and that such actions "amounted to "very, very serious misconduct."" [Exhibit A, pg. 59].

At a February 11, 2014 meeting, "[t]he Board accepted Pearlman's findings and proceeded to discuss Carmicle's performance in managing [the Subs], his improper use of Company funds for personal benefit, his unauthorized spending and advertising commitments, and his improper access to and monitoring of employee email accounts." [Exhibit A, pg. 60]. Thereafter, the Board voted that the CEO should terminate Carmicle for cause. [Exhibit A, pgs. 60-61].

On February 17, 2014, at a meeting in Simpsonville, Kentucky, Carmicle's employment was officially terminated. [Exhibit A, pgs. 8, 62].

Upon returning home from that meeting, Carmicle remotely locked his Company owned-laptop, which remained at BJI. Carmicle claims that he did so accidentally and merely meant to lock his personal laptop. [Exhibit A, pg. 8]. The Court concluded, however, that "Carmicle intentionally locked the Company-owned laptop, despite his testimony [to the contrary]." [Exhibit A, pg. 73, ¶ 8]. The Court also concluded that Carmicle intentionally failed to provide BJI with the password and PIN to unlock the laptop. [Exhibit A, pg. 73, ¶ 8].

On that same day, Carmicle also remotely wiped his Company-owned iPad and restored it to factory settings. [Exhibit A, pg. 63].

"Carmicle also claims to have subsequently lost the personal iPad with which he had taken screenshots of emails, and was therefore, unable to produce it during the course of discovery along with various other data and devices Carmicle claims to have deleted or lost despite the near certainty of impending litigation." [Exhibit A, pg. 8; Exhibit A, pgs. 62-63]. As discussed below, the District Court found that the Debtor's explanation for these missing items lacked candor and that he intentionally destroyed evidence. [Exhibit A, pgs. 70-71].

A. **The District Court Litigation.**

On March 11, 2014, the Company filed a complaint against the Debtor in the District Court for the Southern District of Florida (as amended, the "Florida Complaint"). As relevant to this adversary proceeding, the Florida Complaint included counts for (i) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); and (ii) violation of the Stored Communications Act, 18 U.S.C. § 2701 ("SCA").

On March 21, 2014, the Debtor filed his initial complaint against the Company and certain officers and directors of the Company in Kentucky state court (as amended the "Counter-Complaint"). The Counter-Complaint was ultimately removed to the United States District Court for the Western District of Kentucky, transferred to the Southern District of Florida, and consolidated with the action in which the Florida Complaint was already pending. The Company received summary judgment on seven (7) of the eleven (11) claims in the Debtor's Counter-Complaint.

After a two (2) day evidentiary hearing on sanctions against the Debtor, an eleven (11) day trial was conducted on the claims in the Florida Complaint and the remaining claims in the Counter-Complaint. After the trial, the District Court issued the District Court Opinion and entered a judgment [Case No. 14-6029, Docket No. 268] which: (i) entered judgment in favor of the Company on all remaining counts of the Debtor's Counter-Complaint; (ii) confirmed the Magistrate Judge's prior award of sanctions against the Debtor in the amount of $15,135.00; (iii) imposed additional spoliation sanctions against the Debtor; (iv) entered judgment in favor of the Company on Count I of the Florida Complaint (the CFAA claim) in the amount of $38,622.11 in actual compensatory damages; (v) entered judgment in favor of the Company on Count II of the Florida Complaint (the

-8-

SCA claim) in the amount of $38,332.11 in punitive damages and the Company's attorneys' fees and costs (in a to be determined amount); and (vi) entered a declaratory judgment in favor of the Company that the Debtor was properly terminated for cause.

The Debtor appealed the Court's ruling to the Eleventh Circuit Court of Appeals and on January 25, 2017, the Court of Appeals affirmed the District Court.

On August 22, 2017, the District Court entered a Final Judgment Awarding Attorneys' Fees and Costs [Docket No. 307] (collectively with the judgment at Docket No. 268, the "Judgment", copies of which are attached as Exhibit "B" to the Complaint), which awarded BJI fees and costs on Count II of its Florida Complaint (the SCA claim) in the amount of $911,503.47, for a total judgment of $1,003,582.69, plus post-judgment interest.

In entering its fee judgment, the District Court adopted the Report and Recommendation of the Magistrate Judge (the "Report") [Docket No. 304, a copy of which is attached as Exhibit "C" to the Complaint]. The Report provided that such fees and costs were justified, in part, because the litigation "was significantly prolonged by [the Debtor] and because "the District Court emphasized the intentional nature of Defendant's "egregious conduct"throughout its decision . . ." [Exhibit C, pgs. 10, 19].

More specifically, the Magistrate Judge's Report stated that:

[T]his litigation was significantly prolonged by [the Debtor] who: (1) filed an improper action in Kentucky state court; (2) filed [multiple] unsuccessful motions . . .; (3) filed a motion for leave to amend to add a claim . . . and then withdrew it voluntarily after [the Company] filed their brief in opposition; (4) made a baseless jury demand; (5) opposed and litigated the forensic protocol (and discovery issues related to it); (6) litigated various other discovery related matters which necessitated multiple hearings . . .; (7) insisted on taking 23 depositions; and (8) engaged in evidence spoliation.

[Exhibit C, pg. 10].

In the District Court Opinion, the Court also ruled on BJI's motion for sanctions upon which it had held a two-day evidentiary hearing in advance of the trial. [Exhibit A, pg. 12].

In relevant part, the District Court held:

[T]he Court now concludes that Carmicle should have preserved electronically stored information . . . in anticipation of litigation, and that this information was lost because Carmicle failed to take reasonable steps to preserve it. This information . . . - cannot be restored or replaced through additional discovery . . . [T]he Court finds that Carmicle acted with the intent to deprive [BJI] of the information's use in litigation . . . Carmicle's deliberate deletion and destruction of evidence and lack of candor concerning these actions unquestionably constitutes bad-faith litigation conduct, warranting the imposition of sanctions against him.

[Exhibit A, pgs. 70-71 (emphasis added)].

As noted in the District Court Opinion and incorporated into the Judgment, the Magistrate Judge had previously sanctioned the Debtor for other discovery misconduct by awarding attorneys' fees to the Company in the amount of $15,135.00. [Exhibit A, pgs. 71].

The District Court's view of the Debtor's conduct during the litigation was best summarized by the Magistrate Judge who stated, in ruling on a post-trial motion, that "the District Court emphasized the intentional nature of Defendant's "egregious conduct" throughout its decision, highlighting his spoliation of computerized evidence designed to thwart [the Company's] investigation and diminish their ability to prepare for trial." [Exhibit C, pg. 19].

In fact, in her oral ruling after the evidentiary hearing on sanctions, the District Judge held, on multiple occasions, that the Debtor's testimony was simply "not credible" and that she was "not inclined to believe" him. A copy of the District Court's oral ruling on sanctions is attached as Exhibit "E" to the Complaint. [Exhibit E, pg. 205, lines 11-15 ("Carmicle's testimony . . . is not credible"), lines 15-18 ("It is not credible that Carmicle . . . ), lines 24-25 ("Carmicle's testimony . . . is not credible"), pg. 206, lines 3-5 (Carmicle's testimony . . . is not credible"), lines 6-7

-10-

("Carmicle's testimony . . . is not credible"), lines 9-13 ("Carmicle's inconsistent testimony . . . is not credible"); pg. 207, line 17-19 ("Carmicle's testimony . . . is not credible"); pgs. 207-208, lines 24-5, 1-3 ("the Court is not inclined to believe Carmicle's testimony")].

In entering judgment in favor of the Company on Count II of the Florida Complaint (the SCA claim), the District Court made a number of additional factual findings and conclusions of law. Those findings and conclusion are set forth below.

BJI had a written Computer and Internet Policy. [Exhibit A, pg. 18]. That policy provided that BJI owned and had the right to access all emails and other information stored on or passing through company-owned or issued electronic devices. [Exhibit A, pg. 18]. The policy further provided that "managers" (*i.e.* Carmicle), "who need access for legitimate Company purposes to another employee's email must request such access from a member of corporate [*i.e.* [BJI] senior management." [Exhibit A, pg. 18, pg. 72, ¶ 5].

"It is undisputed that Carmicle intended to access and view the contents of other Company employee's email accounts . . . [and] intended to do so without authorization or to exceed authorized access in doing so." [Exhibit A, pg. 72-73, ¶ 6]

Carmicle was aware of the Computer and Internet Policy before he began accessing multiple BJI email accounts in 2013-2014. [Exhibit A, pg. 72-73, ¶ 6]. Only two years earlier, Carmicle had reviewed the Policy and, in accordance with the Policy, had obtained the ability to view a subordinate's email through delegation. [Exhibit A, pg. 73, ¶ 6]. This "stark change in approach" proves that Carmicle intended to conceal his activities. [Exhibit A, pg. 73, ¶ 6]. In fact, "Carmicle even admitted feeling like he had done something wrong when he accessed and viewed the contents of [the CEO's] email account." [Exhibit A, pg. 95].

-11-

"Carmicle obtained information – whether the content of the email itself, the fact that the email had been sent, to whom, by whom, and when, or other information – each time he accessed an email." [Exhibit A, pg. 72, ¶ 3].

"Carmicle repeatedly engaged in gross negligence or willful misconduct by accessing and viewing the contents of other Company employee's email accounts hundreds of times . . ." [Exhibit A, pg. 75, ¶ 20, pg. 94].

The Court awarded the Company punitive damages on its SCA claim because "exploiting a generic password to access other Company employee's email accounts numerous times over a period of at least six months without any legitimate reason to believe such conduct is authorized is inexcusable." [Exhibit A, pg. 84].

**B. The Bankruptcy Proceeding and the Supersedeas Bond.**

On September 12, 2017, less than ten (10) days after entry of the Judgment, the Debtor filed a petition for relief pursuant to chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

The Debtor's Schedules indicate that, although he earned more than $1.3 million in the eighteen (18) months before his filing, he is recently unemployed and his expenses now exceed his monthly income by more than $10,500.00. Despite his negative monthly income and his purported lack of unencumbered assets, the Debtor has already received approval to reaffirm approximately $1,800,000 of secured mortgage debt (at a cost of approximately $10,000 per month) and has sought to assume Audi and Jaguar leases at a cost of approximately $1,800 per month. Even a cursory review of the main case docket makes it abundantly clear that the Debtor's bankruptcy filing was designed to impair one creditor and one creditor only – the Company.

-12-

In order to appeal the District Court Opinion to the Eleventh Circuit Court of Appeals, the Debtor was required to post a supersedeas bond in the amount of $101,200.00 (the "Bond"). The Company has filed a motion for relief from the automatic stay to obtain possession of the Bond. [Case No. 17-32918, Dkt. No. 14]. After application of the Bond, the amount outstanding under the Judgment will be $902,382.69.

The Trustee, however, has filed a motion for turnover, pursuant to which he argues that the Bond only secures the non-attorneys' fee portion of the Judgment and that, therefore, the estate is entitled to $9,120.78 of the Bond. [Case No. 17-32918, Dkt. No. 26]. The issue of entitlement to the 'surplus' portion of the Bond has been taken under submission by this Court.

On January 4, 2018, the Debtor filed its own Motion for Judgment on the Pleadings / To Dismiss [Dkt. No. 8] (the "Cross-Motion"). The Plaintiffs have filed an objection to the Cross-Motion concurrently with the filing of this Motion.

In the Cross-Motion, the Debtor echoes the position of the Trustee and asserts that the only portion of the Judgment that will not be satisfied by the Bond is the SCA attorneys' fees and that, therefore, the Court need only consider the dischargeability of that award. [Cross-Motion, pg. 11].

In order to simplify this proceeding the Company will agree, for purposes of this Motion (and its corresponding objection to the Cross-Motion), to limit its claims of non-dischargeability to the damages awarded pursuant to Count II of the Florida Complaint (the SCA claim) in the amount of $950,125.58. To the extent that any portion of these damages are ultimately satisfied by the Bond, any non-dischargeability award will be reduced by the amount of that payment. *See*, *Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620, 628 (6th Cir. B.A.P. 2000) (issue of dischargeability not

moot because, even if paid, "such amount would certainly be credited towards the satisfaction of this nondischargeable obligation").

## LEGAL ANALYSIS

### A. Claim under 11 U.S.C. § 523(a)(6) for Willful and Malicious Injury.

Under the Bankruptcy Code, an individual debtor will not be discharged from any debt for "willful and malicious injury by the debtor to another entity or to property of another entity." 11 U.S.C. §523 (a)(6). Whether a debt is nondischargeable based on willful and malicious injury is a question of federal law. *Gellenbeck v. Tomsic (In re Tomsic)*, 104 B.R. 22 (Bankr. N.D. Ind. 1987). The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). The facts of this case as set forth by the District Court establish that the Plaintiffs suffered a willful and malicious injury by the Debtor.

In order to succeed on a claim under § 523(a)(6), the Plaintiffs must show the following: (1) the Debtor's conduct was willful and malicious; (2) the Plaintiffs suffered an injury to its legal rights; and (3) the Plaintiffs' loss was caused by the Debtor's conduct. *Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 2004 W.L. 1544066 (6th Cir. 2004). The Plaintiffs rely on *Best* in support of their claim that an injury under (a)(6), includes "the invasion of the legal rights of another" and "connotes legal injury ... in the technical sense." *See*, Plaintiffs Motion for Judgment on the Pleadings at p.16, citing *Best*, at *6 and *CMEA Title Agency, Inc. v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005). The Plaintiffs state that they suffered an injury as a result of the Debtor's violation of the SCA.

-14-

The Debtor takes issue with this claim contending that "a simple interference with legal rights" is not dispositive of a claim of nondischargeability for "willful and malicious injury." The Court does not view the Plaintiffs cited authority or construe its arguments in support of its position as a claim that it need only show an invasion of a legally protected right to establish its nondischargeability claim under (a)(6). Plaintiffs used this authority to establish that they suffered an injury, one of three requirements to establish a claim under 523(a)(6). The law in the Sixth Circuit firmly supports its position that a violation of one's legal rights constitutes an injury under 523(a)(6). *See*, *Steier v. Best*, 109 Fed. Appx. 1 at *6 (6th Cir. 2004), and cases cited by Plaintiffs at pp. 16-18 of its Motion for Judgment on the Pleadings. Thus, the District Court's findings that Debtor's actions in violating the SCA established that Debtor invaded the legally protected privacy rights of the Company and this constituted the requisite "injury" under the elements of 11 U.S.C. § 523(a)(6).

In addition to finding an "injury", Plaintiffs had to next establish that Debtor's actions in causing the injury were willful and malicious. The term "willful" means deliberate or intentional. *Geiger, 523 U.S. at 61.* The Sixth Circuit has held that a willful and malicious injury under 523(a)(6) is defined as one where the debtor "desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it." *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 922 (6th Cir. B.A.P. 2000), citing *Markowitz v. Campbell (In re Markowitz).* 190 F.3d 455, 464 (6th Cir. 1999).

Here, the District Court determined that the Debtor violated the SCA. Under the very terms of the Act, in order to hold the Debtor liable for a violation of the Act, the District Court had to find that the Debtor violated the Act with "a knowing or intentional state of mind." 18 U.S.C. § 2707(a).

-15-

The District Court's Opinion is replete with findings related to Debtor's actions in intentionally accessing and viewing the Company's employees email accounts, actions that were unauthorized and contrary to the Company's policies.  *See*, Ex.A, pp. 72-73 ("The Court further concludes that Carmicle intended [to access and view] and intended to do so without authorization ...Carmicle intended to circumvent the Policy....").  The Court need look no further than these findings to establish the willfulness element of 11 U.S.C. § 523(a)(6).

Next the Court must determine if Debtor's violation of the SCA was "malicious."  An act is "malicious" if it is undertaken in "conscious disregard of one's duties or without just cause or excuse."  *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).  "Malicious" acts do not "require ill-will or specific intent to do harm."  *Id.*

The District Court's findings lead this Court to conclude that the element of maliciousness was also met.  The District Court specifically stated that the Debtor intended to access the email accounts of Company employees intentionally, and without authority and that he specifically intended to circumvent the Company's Policy in this regard.  *See*, Ex. A, pp. 72-73.  Most importantly, the District Court found, based upon Debtor's own testimony, that he "admitted feeling like he had done something wrong when he accessed and viewed the contents" of the Company's CEO's email account. *See*, Ex. A, p. 95.

In order to conclude that the Debtor violated the SCA and award punitive damages and attorneys' fees, the District Court had to find that the Debtor's actions were without just cause and inexcusable.  The Court finds, based upon the overwhelming weight of the District Court findings, that the Debtor's actions establish all of the elements of a willful and malicious injury under

-16-

11 U.S.C. § 523(a)(6).  Therefore, the Court will enter Judgment in favor of the Plaintiffs on Count I

of the Plaintiffs' Complaint to Determine Dischargeability.

### B. Claim Under 11 U.S.C. § 523(a)(4) for Larceny.

Plaintiffs also seek to have the debt owed to them by Debtor declared nondischargeable

under 11 U.S.C. § 523 (a)(4).   Under that statute a debt "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement or larceny" is nondischargeable.  Here, Plaintiffs claim that the

debt is nondischargeable because Debtor's actions constitute larceny.

In order to succeed on a claim under 11 U.S.C. § 523 (a)(4) for larceny, the Plaintiffs must

show that the Debtor has "wrongfully and with fraudulent intent taken property from its owner."

*Cardwell v. Hester (In re Hester)*, 559 B.R. 683, 478 (Bankr. W.D. Ky. 2016). *See also*, *Sierra*

*Chemicals v. Mosley (In re Mosley)*, 501 B.R. 736,745 (Bankr. D. N.M. 2013).  The Court may infer

fraudulent intent from a debtor's actions and surrounding circumstances. In a nondischargeability

context, intangible property is included within the scope of the statute, and a creditor can be

deprived of his use of intellectual property just as easily as tangible property.  *Monsanto Co. v .*

*Trantham (In re Trantham)*, 304 B.R. 298 (6th Cir. B.A.P. 2004); *In re Alwood*, 531 B.R. 182 (Bankr.

N.D. Ohio 2015).

In *General Motors Acceptance Corp. v. Cline*, 2008 W.L. 2740777 (N.D. Ohio, July 3,

2008), the Court explained larceny under § 523(a)(4) as follows:

> Larceny can be defined as the actual or constructive taking away of property of
> another without the consent and against the will of the owner or possessor with the
> intent to convert the property to the use of someone other than the owner.  Larceny
> for purpose of § 523(a)(4) requires proof that the debtor wrongfully and with
> fraudulent intent took property from its rightful owner. ... Larceny is commonly
> understood to be synonymous with theft. ...

*Id.* at 4.  Another case, *Williams v. Noblit (In re Noblit)*, 372 B.R. 307, 311 (Bankr. E.D. Mich. 2005), described larceny as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner."

The Court finds that Debtor's actions in accessing the emails of the Company's employees was with fraudulent intent, without authorization, against Company policy and done with the purpose of using the property for Debtor's own use.  These actions constitute larceny under 11 U.S.C. § 523(a)(4).

Debtor states that in order for Plaintiffs to succeed on their larceny claim, they must prove that the rightful owner of the property must be deprived of the use or benefit of the property.  Debtor contends that it is this element that prevents Plaintiffs from successfully establishing this claim.  The Court finds little merit in this argument.

Plaintiffs' authority, *In re Mosely*, 501 B.R. 736, 746 (Bankr. D. N.M. 2013), and *FNA Group, Inc. v. Arvanitis (In re Arvanitis)*, 2015 W.L. 5202990,*16,21 (Bankr. N.D. Ill.), supports their claim that transmitting confidential information without authorization constitutes larceny, even though the plaintiffs use of that information was not prevented.  In both cases,  the court found that a debtor who accessed and transferred confidential electronic information without authorization was sufficient to establish a larceny claim under § 523(a)(4).

Here, the Court finds that the District Court Opinion established that the Debtor acted without authorization which interfered with the Plaintiffs rights of confidentiality in the emails accessed by Debtor without authorization and contrary to Company policy.  *See*, District Court Opinion at pp. 72-76 and Court's Critical Findings of Fact at pp. 82-85 on Debtor's violation of the SCA.  Applying the necessary elements of 11 U.S.C. § 523(a)(4), as they apply to a claim of larceny,

this Court concludes the District Court's findings establish each element. Therefore, the Court will enter Judgment in favor of the Plaintiffs on Count II of the Complaint finding the debt owed to the Plaintiffs for his violation of the SCA nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## **CONCLUSION**

For all the above reasons the Court will enter the attached Judgment in favor of the Plaintiffs on Counts I and II of their Complaint to Determine Dischargeability against the Defendant Christopher Alan Carmicle. A Judgment incorporating the findings herein accompanies this Memorandum-Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: July 24, 2018

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER ALAN CARMICLE | ) | Case No. 17-32918(1)(7) |
| | ) | |
| _____ Debtor(s) | ) | |
| | ) | |
| BROWN JORDAN INTERNATIONAL, | ) | AP NO. 17-3069 |
| INC., *et al.* | ) | |
| | ) | |
| Plaintiff (s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER ALAN CARMICLE | ) | |
| | ) | |
| _____ Defendant(s) | ) | |

**<u>JUDGMENT</u>**

This matter is before the Court on the Motion for Judgment on the Pleadings filed by Brown

Jordan International, Inc., BJI Holdings, LLC, Brown Jordan Company and Brown Jordan Services,

Inc. (the "Plaintiffs") in the above-captioned action and the Motion for Judgment on the Pleadings/

to Dismiss filed by Christopher Alan Carmicle (the "Defendant"). The Court having considered the

Motions of both Plaintiffs and Defendant, and any opposition thereto, and being otherwise fully

advised in the premises,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Plaintiffs' Motion

is **GRANTED** and the Defendant's Motion is **DENIED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that $950,125.28 of the

Plaintiffs' Judgment and Claim in Chapter 7 Case No. 17-32918 is attributable to the Defendant's

violation of the Stored Communications Act and is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6).

      This is a final and appealable Judgment.

Joan A. Lloyd
United States Bankruptcy Judge

Dated:  July 24, 2018